# United States Court of Appeals
## For the First Circuit

---

No. 23-2000

US GHOST ADVENTURES, LLC,

Plaintiff, Appellant,

v.

MISS LIZZIE'S COFFEE LLC and JOSEPH PEREIRA, Individually,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

---

Before

Barron, Chief Judge,
Selya and Gelpí, Circuit Judges.

---

Christoper D. Strang, Strang, Scott & Giroux, LLP, Pietro Sanitate, Timothy Bechen, Woods Rogers Vandeventer Black PLC, Genesis Guzman, Michael P. Mullins, and Day Pitney LLP on brief for appellant.

Joseph Pereira, pro se, on brief for appellee Joseph Pereira.

Matthew J. Ginsburg, Ascendant Law Group LLC, Daniel J. Larson, and Larson Law LLC for appellee Miss Lizzie's Coffee LLC.

---

November 15, 2024

---

**SELYA**, <u>Circuit Judge</u>.  The Lizzie Borden House is located in Fall River, Massachusetts.  It bears a storied history that originates with the still-unsolved murders — in 1892 — of Lizzie Borden's father and stepmother.  Prosecutors alleged that Borden hacked her parents to death with a hatchet in their family home.[1]  But these allegations were never proven:  in the ensuing "trial of the century," a jury acquitted Lizzie of all charges.  This macabre tale not only has permeated the national consciousness but also has turned Borden's ancestral home into a destination for those with a taste for the supernatural.  It is against this grizzly backdrop that the case at hand arises.

I

We briefly rehearse the relevant facts and travel of the case.  We glean the facts from the district court's findings and the record below.  <u>See</u> <u>Waldron</u> v. <u>George Weston Bakeries Inc.</u>, 570 F.3d 5, 7 (1st Cir. 2009).

A

US Ghost Adventures, LLC (Ghost Adventures) provides ghost tours and related hospitality services across the United States.  The firm owns a bed and breakfast that is operated out of

---

[1] These allegations gave rise to a bloody bit of doggerel that has gained increasing notoriety with the passage of time:  "Lizzie Borden took an axe / And gave her mother forty whacks; / And when she saw what she had done / She gave her father forty-one."  <u>Lizzie Borden</u>, Britannica (Sept. 20, 2024), https://www.britannica.com/biography/Lizzie-Borden-American-murder-suspect.

the Lizzie Borden House in Fall River.  This venue features a museum, so-called "ghost tours," and kindred activities.  The commercial success of the business depends in large part on the Lizzie Borden name and lore.  To this end, Ghost Adventures owns an incontestable federal trademark on both the name "Lizzie Borden" as used in hotel and restaurant services and on a realistic hatchet logo displaying a notched blade, which hearkens back to the implement that allegedly killed Borden's parents.[2]

Miss Lizzie's Coffee LLC (Miss Lizzie's) recently opened a coffee shop next door to the Lizzie Borden House.[3]  It, too, markets itself by reference to the Lizzie Borden saga.  Its storefront signage displays the words "Miss Lizzie's Coffee" between a cup of coffee and a stylized hatchet spewing blood.  A second sign, with similar accoutrements, advertises Miss Lizzie's as "The Most Haunted Coffee Shop in the World!"  The hatchets on both signs include handles and dramatic blood splatters.

---

[2] If a registered trademark has been consistently used for five consecutive years from the date of federal registration and complies with other statutory formalities, it becomes "incontestable" (that is, impervious to certain challenges to its use).  See 15 U.S.C. § 1065; Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 117 & n.3 (1st Cir. 2006).  It is undisputed that Ghost Adventures' trademarks satisfy this definition.

[3] The other named defendant, Joseph Pereira, owns Miss Lizzie's.  For ease in exposition, we refer to the defendants collectively as "Miss Lizzie's."

Since Miss Lizzie's opened, some visitors have incorrectly assumed that the Lizzie Borden House and Miss Lizzie's are affiliated. Seven Ghost Adventures employees attested by declaration that various customers have either expressed the belief that the establishments were related or inquired whether such a relationship existed. One tour guide explained that guests were frustrated to learn that they could not bring Miss Lizzie's coffee on their tours of the Lizzie Borden House, having bought the coffee under the erroneous impression that the coffee shop was affiliated with the historical site. Another visitor separately attested to his belief that the businesses were affiliated. And Ghost Adventures' director of operations recounted that a Fall River city official had telephoned the company to discuss its "new business in the building next door named Miss Lizzie's."

**B**

On September 18, 2023, Ghost Adventures sued Miss Lizzie's in the federal district court for, inter alia, trademark infringement and unfair competition. See US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC, No. 23-12116, 2023 WL 8367730, at *1 (D. Mass. Oct. 27, 2023). Hot on the heels of the commencement of suit, Ghost Adventures moved for a temporary restraining order and/or preliminary injunction based on its trademark infringement claim. See id.; see also Fed. R. Civ. P. 65(a), (b). It sought to enjoin Miss Lizzie's from using either the "Lizzie Borden"

trademark or the hatchet logo in the coffee shop's trade names, trade dress, and marketing materials.  See Ghost Adventures, 2023 WL 8367730, at *1.  Miss Lizzie's objected, asserting that it had not infringed either trademark.

The district court heard Ghost Adventures' motion for preliminary injunction on the papers.  See id.  Applying the customary four-part test, the court held that Ghost Adventures had failed to show a likelihood of success on the merits.  See id. The court explained that "the key element in any infringement action is likelihood of confusion."  Id.; see Pignons S. A. de Mecanique de Precision v. Polaroid Corp., 657 F.2d 482, 486-87 (1st Cir. 1981).  Specifically, "the alleged infringement must create 'a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care.'"  Ghost Adventures, 2023 WL 8367730, at *1 (quoting Bos. Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 12 (1st Cir. 2008)).  The court further explained that "Ghost Adventures must demonstrate that Miss Lizzie's 'used an imitation of its protected mark in commerce in a way that is likely to cause confusion, or to cause mistake, or to deceive.'"  Id. (quoting Swarovski Aktiengesellschaft v. Bldg. No. 19, Inc., 704 F.3d 44, 48-49 (1st Cir. 2013) (internal quotation marks omitted)).

The court concluded that Ghost Adventures had failed to demonstrate a likelihood of confusion.  Id.  To begin, the court

found that the hatchet displayed on Miss Lizzie's signage was "not at all the hatchet trademarked by Ghost Adventures" nor even "a colorable imitation of it." Id. at *2. Miss Lizzie's hatchet has a handle and smooth axe blade that spews blood. See id. Ghost Adventures' hatchet is bereft of either handle or blood and features a notch halfway along the blade. See id.

Next, the district court found that "Miss Lizzie's mark associates its business with the historical story of Lizzie Borden, not the mark 'Lizzie Borden'" that Ghost Adventures owns. Id. Although "Ghost Adventures has an 'incontestable' trademark in 'Lizzie Borden' and its hatchet, Miss Lizzie's is using neither the mark 'Lizzie Borden' nor the Ghost Adventures hatchet." Id. In any event, "Ghost Adventures has not demonstrated that its mark bears the strength which might give it the 'secondary meaning' reach that, for example, 'Sam Adams Beer' might claim regarding the historical figure Sam Adams." Id. (citing Peoples Fed. Sav. Bank v. People's United Bank, 672 F.3d 1, 6-7 (1st Cir. 2012)).

Importantly, the court ranked Ghost Adventures' evidence of customer confusion as "limited" and "contradicted to some extent by the evidence from Miss Lizzie's of the absence of confusion." Id. It found that any customer confusion was caused by three factors: the proximity of the establishments, their common but independent reliance on the Lizzie Borden tale, and the tendency to associate services related to a historical site with the site

itself.  See id.  The court did not credit any claim that confusion
was caused by the similarity of the businesses' marks.  Id. at *2
n.3.  After all, "the same issues would arise if Miss Lizzie's
called its cafe 'Forty Whacks Coffee' and used a different image
as its logo."  Id. at *2.

There was more.  The district court noted that although
both businesses provide hospitality services, the two sell
different goods to different customers:  "on one hand,
sophisticated buyers who come from afar with tickets or
reservations to experience the Lizzie Borden House; and the other,
buyers seeking food or coffee."  Id.  The absence of direct
competition weakened the claim of confusion.  See id.

The court made two additional points.  First, it noted
the fact that the parties rely on different forms of advertising.
See id. at *3.  Second, it noted that a sign on Miss Lizzie's
storefront explicitly disclaimed any relationship with the
neighboring Lizzie Borden House.  See id. at *4.  Such a disclaimer
can "tip the scales to a finding of no likelihood of confusion and
no infringement" where, as here, "the multi-factor analysis points
to a low likelihood of confusion."  Id. (citing 4 J. Thomas
McCarthy, McCarthy on Trademarks and Unfair Competition § 23:51
(4th ed. 2002) [hereinafter McCarthy on Trademarks]).

Consistent with this analysis, the district court
concluded that Ghost Adventures was unlikely to succeed on the

merits of its claims and denied the preliminary injunction. <u>See</u>
<u>id.</u> at *4. This timely appeal followed. <u>See</u> 28 U.S.C.
§ 1292(a)(1).

## II

We turn first to the standard of review applicable to
the disposition of motions for preliminary injunctive relief. We
apply this standard with the understanding that "[a] preliminary
injunction is an extraordinary and drastic remedy that is never
awarded as of right." <u>Peoples Fed. Sav. Bank</u>, 672 F.3d at 8-9
(quoting <u>Voice of the Arab World, Inc.</u> v. <u>MDTV Med. News Now, Inc.</u>,
645 F.3d 26, 32 (1st Cir. 2011)).

We have constructed a four-part framework to determine
whether preliminary injunctive relief is warranted. <u>See</u> <u>Ryan</u> v.
<u>U.S. Immigr. and Customs Enf't</u>, 974 F.3d 9, 18 (1st Cir. 2020).
The district court must consider "the movant's likelihood of
success on the merits; whether and to what extent the movant will
suffer irreparable harm in the absence of preliminary injunctive
relief; the balance of relative hardships . . . ; and the effect,
if any, that either a preliminary injunction or the absence of one
will have on the public interest." <u>Id.</u>

Our review of a district court's decision to grant or
deny a preliminary injunction is for abuse of discretion. <u>See id.</u>
Under this rubric, we examine answers to abstract legal questions
de novo, findings of fact for clear error, and judgment calls with

significant deference to the trial court.  See id.  A district court abuses its discretion, for example, by committing material legal error, "ignor[ing] pertinent elements deserving significant weight, consider[ing] improper criteria, or, though assessing all appropriate and no inappropriate factors, plainly err[ing] in balancing them."  Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996).

### III

Likelihood of success on the merits is the sine qua non of the preliminary injunction analysis.  See Ryan, 974 F.3d at 18. "This emphasis on likelihood of success is fully consistent with the tenet that, as a matter of public policy, trademarks should be protected against infringing uses."  Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 115 (1st Cir. 2006).  "If the movant 'cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.'" Ryan, 974 F.3d at 18 (quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002)).

To show trademark infringement, a plaintiff "must demonstrate both that its mark merits protection and that the allegedly infringing use is likely to result in consumer confusion."  Borinquen Biscuit, 443 F.3d at 116.  Here, there is no dispute that Ghost Adventures' registered marks are entitled to protection.  Accordingly, we train the lens of our inquiry on

whether the allegedly infringing marks are likely to cause consumer confusion.

The prevention of confusion is "the touchstone of trademark protection." Dorpan, S.L. v. Hotel Melia, Inc., 728 F.3d 55, 61 (1st Cir. 2013). "Where there is no likelihood of confusion by the alleged infringer 'there is no impairment of the interest that the trademark statute protects.'" Id. (quoting Libman Co. v. Vining Indus., Inc., 69 F.3d 1360, 1361 (7th Cir. 1995)). Moreover, trademark infringement requires "more than the theoretical possibility of confusion"; there must be "a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care." Bos. Duck Tours, 531 F.3d at 12 (quoting Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 200-01 (1st Cir. 1996)).

Eight factors combine to determine the likelihood of confusion:

> (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark.

Borinquen Biscuit, 443 F.3d at 120; see Pignons, 657 F.2d at 487. Although an inquiring court ordinarily should examine each factor, no single factor will carry the day. See Borinquen Biscuit, 443

F.3d at 120.  Finally, where there is a low likelihood of consumer confusion, a disclaimer of connection between marks may "tip the scales" towards a finding of no likelihood of confusion.  3 McCarthy on Trademarks § 23:51 (5th ed. 2024).

Ghost Adventures gives just short of forty whacks to the district court's finding that Miss Lizzie's moniker and hatchet posed a low risk of confusing consumers.  Because likelihood of confusion is fact-specific and situation-specific, our review of the district court's finding is for clear error.  See Borinquen Biscuit, 443 F.3d at 116.  With the stage set, we turn to the compendium of facts cited by Ghost Adventures.

### A

For starters, Ghost Adventures decries the district court's comparison of the two protagonists' marks, complaining that the court improperly elevated a side-by-side comparison of the parties' hatchet logos over their shared use of the dominant word "Lizzie."  We do not agree.

Similarity between marks is determined by analyzing their sight, sound, and meaning and requires consideration of "the total effect of the designation, rather than a comparison of individual features." Bos. Duck Tours, 531 F.3d at 24 (quoting Pignons, 657 F.2d at 487); see Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 817 (1st Cir. 1987).  "Even if elements of each party's mark overlap, or are visually similar, the marks

as a whole may still create a distinct commercial impression, especially if the similarities are limited to generic or descriptive elements." <u>Bos. Duck Tours</u>, 531 F.3d at 29.

The district court supportably found that "Miss Lizzie's hatchet is neither the trademarked hatchet nor a colorable imitation of it." <u>Ghost Adventures</u>, 2023 WL 8367730, at *1. This finding rested on several differences between the images. The trademarked hatchet features only a notched blade, whereas Miss Lizzie's bears a handle and a smooth blade. <u>See</u> <u>id.</u> Miss Lizzie's hatchet spews blood, whereas Ghost Adventures' is spotless. <u>See</u> <u>id.</u> Indeed, it appears that the only similarity between the hatchet logos is that they both depict hatchets. The court, then, did not clearly err in finding that the hatchet logos are facially dissimilar. <u>See</u> <u>id.</u> With respect to the name itself, the district court supportably found that Miss Lizzie's reference to "Lizzie" was to the lore of Lizzie Borden — which Ghost Adventures does not own — rather than to the mark "Lizzie Borden."[4] <u>See</u> <u>id.</u> at *2. Thus, the meaning associated with the name "Miss Lizzie's Coffee" is only incidentally similar to that of the "Lizzie Borden House."

---

[4] Ghost Adventures attempts to minimize this distinction by suggesting that consumers may associate "Lizzie Borden" with its services rather than with Lizzie Borden herself. But the district court rejected this suggestion, finding that Ghost Adventures had not shown that its mark has displaced the story of Lizzie Borden in the minds of consumers. <u>See</u> <u>Ghost Adventures</u>, 2023 WL 8367730, at *2. Ghost Adventures does not offer even the specter of a reason to disturb this finding.

Viewed against this background, Ghost Adventures' assertion that the district court improperly failed to consider the overall commercial impression of the two marks comes up empty.

### B

This brings the question of market similarity front and center. A court must assess likelihood of confusion due to market similarity by comparing the similarity of the parties' goods, the relationship between their channels of trade, the relationship between their advertising, and the classes of prospective purchasers. See Pignons, 657 F.2d at 487; see also Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp., 376 F.3d 8, 19 (1st Cir. 2004) (considering channels of trade, advertising, and prospective purchasers "together because they tend to be interrelated"). Ghost Adventures assigns error to the district court's finding that the parties' markets differ, arguing that both businesses provide "hospitality services," stand in physical proximity, and trade on the Lizzie Borden tale. This argument is unconvincing.

As the district court conceded, both establishments do offer hospitality services. See Ghost Adventures, 2023 WL 8367730, at *2. The fact that the businesses operate in the same broad economic sector, however, proves very little. See Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc., 718 F.2d 1201, 1206 (1st Cir. 1983) (concluding that the "broad inference" that both parties operated in the "medical or health care field" was

insufficient to support likelihood of confusion).  The district court supportably found that the parties sell and market different goods and services to different consumers:  Ghost Adventures attracts sophisticated tourists who purchase tickets in advance and travel to Fall River to visit the historical site of the Lizzie Borden House, whereas Miss Lizzie's attracts passersby hoping for a caffeine kick or a bite to eat.  See Ghost Adventures, 2023 WL 8367730, at *2.  That Ghost Adventures would prefer the court to view the two businesses through the wider lens of "hospitality services" does not cast doubt on the appropriateness of the court's distinction.

In a related vein, Ghost Adventures contends that the parties' proximity and common reliance on the Lizzie Borden story heralds similarity in their channels of trade and advertising methods.  Because other museums run affiliated on-premises food establishments, Ghost Adventures reasons, visitors are apt to think that Miss Lizzie's is associated with the Lizzie Borden House.

The district court rejected this reasoning.  It supportably found that any confusion due to proximity or common reference to historical lore is not the type of confusion that trademark owners may prevent.  See id. at *2.  Ghost Adventures' registration of the mark "Lizzie Borden" did not prohibit other businesses in the hospitality industry from setting up shop in the

vicinity of the Lizzie Borden House.  Nor did it prohibit such businesses from marketing themselves by the use of Lizzie Borden's story.

### C

This leaves Ghost Adventures' assault on the district court's treatment of its evidence of actual consumer confusion. Ghost Adventures says that even though this evidence was "admissible and largely uncontradicted," the court ignored it.  We are not persuaded.

To be sure, "[e]vidence of actual confusion is often considered the most persuasive evidence of likelihood of confusion because past confusion is frequently a strong indicator of future confusion." Beacon Mut. Ins. Co., 376 F.3d at 18.  Here, however, the district court did not ignore the evidence of actual confusion but, rather, interpreted that evidence differently than Ghost Adventures would have liked.  The court found that the confusion about Miss Lizzie's relationship to the Lizzie Borden House arose from "three sources: both businesses operate in close physical proximity; both trade off the Lizzie Borden story; and many customers generally associate services related to a historical site, such as gift shops and cafes, with the nearby historical site itself." Ghost Adventures, 2023 WL 8367730, at *2.  In the district court's view, then, any confusion did not "aris[e] from infringement of Ghost Adventures' trademarks." Id.

This finding was not clearly erroneous.  The relevant consumer confusion in a trademark infringement action is confusion caused by an infringing mark.  Consumer confusion due to non-trademarked similarities between businesses or products does not indicate infringement.  For example, if two outdoor Saturday farmers' markets opened on the same block, causing wandering shoppers to think that they were affiliated, their proximity and similar business models, without more, would not be suggestive of trademark infringement.  This basic principle tracks a core purpose of trademark law: to prevent a copycat from appropriating the goodwill of a brand by wrongly copying the brand's mark.  See Bos. Duck Tours, 531 F.3d at 12.  Because the district court supportably found that the source of consumer confusion was not the similarity of their marks, but something else altogether, the evidence of confusion relied upon by Ghost Adventures is of no consequence.

**D**

Ghost Adventures hints in this court — as it did in the court below — that Miss Lizzie's intended to infringe its trademarks.  Ghost Adventures hinges this suggestion on its allegations that the coffee shop "opened a location in immediate proximity to [Ghost Adventures'] business" and "intentionally used the word 'Lizzie' and a hatchet in [its] name and signage."  Because this argument was neither developed nor supported by on-point authority, we deem it waived.  See United States v. Zannino,

895 F.2d 1, 17 (1st Cir. 1990).  And at any rate, the district court supportably found that Miss Lizzie's sought to benefit from the Lizzie Borden story in its own right, not from the manner in which Ghost Adventures used that story.  Moreover, the district court did not clearly err in determining that, "given the historical significance of the location," neither Miss Lizzie's acts alone nor those acts "considered in light of the entire record" evince an intent to appropriate Ghost Adventures' trademark.  Ghost Adventures, 2023 WL 8367730, at *2.

### E

Ghost Adventures' challenge to the district court's assessment of the strength of its marks is haunted by legal confusion.  It submits that the court underestimated the strength of its marks by failing to give appropriate weight to their incontestability and secondary meaning.  Incontestability and secondary meaning are distinct from a mark's strength.

To assess the strength of a mark, "[w]e look to 'the length of time the mark has been used, its renown in the plaintiff's field of business, and the plaintiff's actions to promote the mark.'"  Beacon Mut. Ins. Co., 376 F.3d at 19 (quoting Star Fin. Servs. v. Aastar Mortg. Corp., 89 F.3d 5, 11 (1st Cir. 1996)).  In the case at hand, the district court found that Ghost Adventures' mark was not strong enough to displace consumers' association with the real Lizzie Borden.  See Ghost Adventures,

2023 WL 8367730, at *2.  Ghost Adventures' assertions that its predecessors relied on the mark for many years and that it has a "long history of investing" in the mark fail to illuminate any clear error.

We turn next to Ghost Adventures' arguments about its marks' incontestability and secondary meaning.  These concepts are related to strength only in a limited way.  We explain briefly.  An incontestable mark is presumed to have acquired secondary meaning.  See 2 McCarthy on Trademarks § 15:35 (5th ed. 2024); Borinquen Biscuit, 443 F.3d at 117.  In turn, secondary meaning refers to the acquired distinctiveness of a mark in the minds of the public, such that "consumers associate it with a particular producer or source." Bos. Beer Co. P'ship v. Slesar Bros. Brewing Co., 9 F.3d 175, 180 (1st Cir. 1993).  The determination of secondary meaning "is a threshold issue of trademark validity" that we need not tackle because Miss Lizzie's concedes that Ghost Adventures' marks are valid.  2 McCarthy on Trademarks § 15:25 (5th ed. 2024).

Secondary meaning relates to the strength of a mark only to the extent that it is "a label given to that quantum of 'strength' sufficient to activate some terms into life as a valid trademark." Id.  Seen in this light, "[t]he difference between commercial strength and secondary meaning is that the former is a range, while the latter is a threshold: a mark may enjoy anything

from a high degree of commercial strength to a low degree, but either it has secondary meaning or it does not." Water Pik, Inc. v. Med-Sys., Inc., 726 F.3d 1136, 1154 (10th Cir. 2013). Once a mark has more than the minimum amount of strength required to create secondary meaning, the existence of secondary meaning does not affect the degree of strength. So viewed, Ghost Adventures' insistence that its marks are incontestable and have secondary meaning does little to advance its claim that its marks are strong.[5]

**F**

Ghost Adventures complains that the court's reliance on a disclaimer on Miss Lizzie's website was problematic. That disclaimer reads: "Our GHOSTS are totally independent and not to be confused with any other Ghosts!" But the district court did not mention, much less rely on, this spooky phrase. Instead, the court discussed a sign taped to Miss Lizzie's storefront that conspicuously reads: "Miss Lizzie's Coffee is NOT ASSOCIATED, NOR AFFILIATED in any way with the Lizzie Borden Museum or Bed and Breakfast next door, nor any other business." The court supportably found that this clarification "further distinguish[ed]

---

[5] We agree that the district court confusingly used the term "secondary meaning" in making its finding about the strength of the mark. See Ghost Adventures, 2023 WL 8367730, at *2. Even so, we think that the court's rescript read as a whole makes sufficiently clear the supportability of its findings about the strength of the mark.

the businesses," noting that effective disclaimers can "tip the scales to a finding of no likelihood of confusion and no infringement." Ghost Adventures, 2023 WL 8367730, at *4 (quoting 4 McCarthy on Trademarks § 23:51 (4th ed. 2002)).

### IV

In a last-ditch effort to turn the tide, Ghost Adventures challenges the district court's failure to "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a); see TEC Eng'g Corp. v. Budget Molders Supply, Inc., 82 F.3d 542, 545 (1st Cir. 1996) (explaining that district court's "decision to grant or deny a preliminary injunction must be supported by adequate findings of fact and conclusions of law"). This challenge has no more force than an apparition.

Rule 52(a) is "intended to assure that the district court gives appropriate consideration to all essential relevant factors and provides an adequate basis for meaningful appellate review of its decision." TEC Eng'g, 82 F.3d at 545; see 9C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2571 (3d ed. 2024). A reviewing court need not insist upon literal compliance with the rule if its "review of the record substantially eliminates all reasonable doubt as to the basis of the district court's decision." TEC Eng'g, 82 F.3d at 545. This is such a case.

In this instance, substance prevails over form.  The district court's rescript — though not specifically divided into findings of fact and conclusions of law — serves the core purpose of Rule 52(a).  The district court's rescript is thorough.  It makes pellucid the court's findings and reasoning on each disputed issue.  We have no difficulty in identifying the relevant factual findings and the reasons why the district court concluded that the facts as found did not support Ghost Adventures' bid for injunctive relief.  No more was exigible to achieve substantial compliance with the requirements of Rule 52(a).  See, e.g., id.; Conservation L. Found., Inc. v. Busey, 79 F.3d 1250, 1271 (1st Cir. 1996); Applewood Landscape & Nursery Co. v. Hollingsworth, 884 F.2d 1502, 1503-04 (1st Cir. 1989).

**V**

We need go no further.  For the reasons elucidated above, the judgment of the district court is

**<u>Affirmed</u>**.